IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. DKC-21-224 |
| | * | |
| KENNETH DODD | * | |
| | * | |
| | * | |

*******

### SENTENCING MEMORANDOM

The United States of America, by and through its undersigned counsel, hereby submits its sentencing memorandum in advance of Kenneth Dodd's ("the Defendant" or "Dodd") sentencing currently scheduled for September 13, 2024 at 2 p.m.

In 2004, the Defendant was convicted in the District of Columbia of conspiracy to distribute and possess with intent to distribute one kilogram or more of PCP and ecstasy, and 50 grams or more of cocaine base, and well as conspiracy to participate in a racketeering organization. As a result, the Defendant was sentenced to 287 months' incarceration. While serving that sentence at a Bureau of Prisons ("BOP") facility in North Carolina, the Defendant was convicted of conspiracy to commit bribery and bribery of a public official, which involved the smuggling of contraband into the federal facility and paying bribes to correctional officers to do so. The Defendant was sentenced in the Eastern District of North Carolina to 37 months imprisonment, to be served consecutive to his District of Columbia sentence.

Then, again while serving the District of Columbia and Eastern District of North Carolina sentences, the Defendant committed the instant offense, which involved conspiring with other inmates, including Jonathan Henry ("Henry") and Jason Haddox ("Haddox"), at FCI Fort Dix to

1

file false unemployment insurance claims using the personal identifying information ("PII") of others.   The defendant is currently projected to be released December 16, 2026.

For the reasons that follow, the Government submits that the Defendant should be sentenced to 51 months' imprisonment, to be served consecutive to his current terms of imprisonment.   This sentence is sufficient but not greater than necessary to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

## The Guidelines

The defendant pled guilty pursuant to a Plea Agreement to conspiracy to commit wire fraud and mail fraud.   The defendant, the Government, and the United States Probation Office ("USPO") all agree that the defendant's base offense level is **7**, pursuant to United States Sentence Guidelines ("U.S.S.G.") § 2B1.1.   All parties also agree that the following enhancements apply:

- A **2**-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims; and

- A **2**-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the defendant intentionally engaged in or cause the conduct constituting sophisticated means.

The Defendant and the Government also agree that a **2**-level enhancement applies, pursuant to U.S.S.G. § 2B1.1(b)(11), because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification.[1]

---

[1] The scheme involved the use of means of identification (i.e., names, social security numbers, dates of birth) to obtain other means' of identification (i.e., debit cards with unique electronic identification numbers).   Moreover, this enhancement would apply under the additional subset that the offense involved the possession or use of any authentication feature.   Application Note 10(C)(ii) provides two applicable examples:   "(I) A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's

The Defendant asserts that an **8**-level enhancement applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(E), because the loss involved in the offense was more than $95,000 but not more than $150,000. The Government's position is that a **10**-level enhancement applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(F), because the loss involved in the offense was more than $150,000 but not more than $250,000.[2]

The Defendant, the Government, and the USPO all agree that a **3**-level decrease applies due to the Defendant's prompt acceptance of responsibility.

The Government agrees with the USPO that the Defendant's criminal history category is III. As such, the Government's position is that the Defendant's final adjusted offense level is 20/III, and therefore the advisory guidelines range is **41 – 51 months.** The Defendant's position is that the Defendant's final adjusted offense level is 18/III, with a final advisory guidelines range of **33 – 41 months**.[3]

The Defendant and the Government also agree that, pursuant to U.S.S.G. § 5G1.3(a), because the instant offense was committed while the Defendant was serving a term of imprisonment, the sentence for the instant offense shall be imposed to run <u>consecutively</u> to the undischarged term of imprisonment.

---

mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully"; and "(II) A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully."

[2] The USPO asserts that a 16-level enhancement applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the loss involved in the offense was more than $1,500,000 but less than $3,500,000.

[3] The USPO asserts that the Defendant's final adjusted offense level is 24/III (63 – 78 months).

**Loss Amount**

As set forth in the statement of facts attached to the Defendant's plea agreement, the Government seized three notebooks during searches of the conspirators' cells at FCI Fort Dix. These three notebooks each contained PII which were used by the co-conspirators to file the false unemployment claims, typically in Maryland.  To calculate loss amounts, law enforcement ran the PII through the Maryland Department of Labor ("MD DOL") database to determine which of the PII was used to file actual claims and, of those, what the loss amount attributable to those claims were.  The notebooks were seized from three locations and included the actual loss as follows:

- "Henry Notebook 1":   This notebook was seized from Henry's hands on July 11, 2020 and contained PII of approximately 269 individuals.   Of these, approximately 138 claims were submitted to MD DOL for an actual loss to MD DOL of $1,730,943.

- "Dodd Notebook 1":   This notebook was seized from Dodd's cell on July 11, 2020 and contained PII for approximately 89 individuals.  Of these, approximately eight claims were submitted to MD DOL for an actual loss of $112,683.

- "Henry Notebook 2":   This notebook was seized on August 5, 2020 and contained PII for approximately five individuals.  Of these, approximately four claims were submitted to MD DOL for an actual loss of $39,920.

In total, the PII contained within these notebooks were used to submit approximately 191 attempted unemployment claims, and approximately 152 claims were actually paid out in Maryland for a total of 184 Maryland benefit debit cards (totally approximately $1.8 million in actual loss).

The Defendant asserts that only the actual loss amount attributable to him is the $112,683 related to the eight individual claims to MD DOL associated with the PII found in his notebook seized on July 11, 2020.  While the Government does not assert that all $1.8 million of additional actual loss was reasonably foreseeable to the Defendant, the Government asserts that at least $150,000 but not more than $250,000 of actual or intended loss was reasonably foreseeable to Dodd by a preponderance of the evidence.

A. <u>Legal Standard</u>

Unlike a trial, at sentencing the standard of proof is a preponderance of the evidence. *United States v. Brooks*, 957 F.2d 1138, 1148 (4th Cir. 1992).  The Fourth Circuit has repeatedly held, post-*Booker*, that the standard of proving sentencing guideline factors remains by a preponderance. *See, e.g., United States v. Grubbs*, 585 F.3d 793, 798-99 (4th Cir. 2009); *United States v. White*, 405 F.3d 208, 219 (4th Cir. 2005).

Moreover, it is undisputed that at a sentencing hearing, the court may consider a "broad scope" of information. *United States v. Falesbork*, 5 F.3d 715, 722 (4th Cir. 1993).  Since before the founding of our Nation, sentencing judges have relied upon a wide array of "'sources and types of evidence . . . to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law.'" *Witte v. United States*, 515 U.S. 389, 397-98 (1995) (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949)).  As the Supreme Court articulated in *Witte*, "a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."  *Id*. at 398 (internal quotations and citations removed).

This broad view as to the admissibility of evidence during sentencing is mandated in 18 U.S.C. § 3661, which states, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Both the U.S. Sentencing Guidelines and the Federal Rules of Evidence reiterate the broad range of evidence available for a court's consideration at sentencing, with the Guidelines permitting all relevant and reliable evidence. U.S.S.G. § 6A1.3(a) ("sentencing judges are not restricted to information that would be admissible at trial."); Fed. R. Evid. 1101(d)(3) (exempting sentencing proceedings from the Federal Rules of Evidence). The Fourth Circuit's statement in *United States v. Bowman*, 926 F.2d 380, 381 (4th Cir. 1991), aptly summarizes this principle: "[t]he type of information to be considered by a sentencing judge is unlimited." Thus, a sentencing judge may consider any relevant and reliable evidence in determining a defendant's sentence.

To determine the appropriate loss enhancement under the Sentencing Guidelines, the Court may consider both the loss caused by the offense of conviction as well as the relevant conduct of the defendant and his co-conspirators that resulted in that loss. U.S.S.G. § 1B1.3. Specifically, in the case of a jointly undertaken criminal activity, as here, the loss is determined based on the defendant's own conduct *and* "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity . . ." U.S.S.G. § 1B1.3(a)(1)(A), (B).[4]

---

[4] Application Note 4(C)(ii) provides the following example: "Defendants F and G, working together, design and

The district court "need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n. 3(C), based on a preponderance of the evidence. *United States v. Savage*, 885 F.3d 212, 226-28 (4th Cir. 2018) (approving sentence based on reasonable estimate of "intended loss"); *McLean*, 715 F.3d at 144 (*citing United States v. Mehta*, 594 F.3d 277, 282 (4th Cir.2010)). "'[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.'" *United States v. Halstead*, 261 Fed. Appx. 472, 475 (4th Cir. 2008) (*citing United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003) (citing U.S.S.G. § 2F1.1, cmt. n. 9)).

The Sentencing Guidelines and, most recently, the Fourth Circuit, have made clear that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A). "Intended loss" refers to the pecuniary harm that the defendant purposely sought to inflict. U.S.S.G. § 2B1.1, cmt. n. 3(A)(ii); *United States v. Maggie Anne Boler*, No. 23-4352 (4th Cir, May 9, 2024).

B. <u>Argument</u>

Although the notebook seized from Dodd's cell resulted in only $112,000 of actual loss, at least $150,000 but not more than $250,000 of loss was within the scope of the conspiracy, in furtherance of the criminal activity, and reasonably foreseeable to the Defendant.

*First*, Dodd's notebook contained the PII of approximately 89 individuals. *See generally* Exhibit ("Ex") 1 (Dodd Notebook 1). Of these, only eight individuals' PII was submitted to the

---

execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the entire amount ($55,000). Each defendant is accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was within the scope of the jointly undertaken criminal activity (the scheme to sell fraudulent stocks), was in furtherance of that criminal activity, and was reasonably foreseeable in connection with that criminal activity."

MD DOL, which resulted in loss of approximately $112,000. That leaves over 80 individuals' PII which either had not yet been submitted to MD DOL, were submitted to states other than Maryland, and/or who were unsuccessfully submitted. While the amount of unemployment insurance that would have been granted is difficult to calculate, it is clear that intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur," U.S.S.G. § 2B1.1, app. Note 3(A)(ii), such as not being able to continue to submit unemployment claims using the PII in the notebook because the notebook was seized from the Defendant.

Indeed, the Defendant's notations within his notebook suggest that the Defendant submitted or caused to be submitted claims in addition to the eight claims submitted to MD DOL. For example, on page 2 of the notebook, the PII of Victim J.C. is written down with the notation "Total Balance: 10,240." Ex. 1, at 2. Victim J.C. is *not* one of the victims according to MD DOL, suggesting that this victim's claim was submitted to another state. The same is true for Victims A.V.A and M.T. on page 7: there is a check mark and notation "9,700," for both, neither of which are included in the MD DOL loss figure.

Moreover, on page 6 of the notebook, there are three victims under the notation "Processing," which suggests that those fraudulent unemployment claims were in process. Those three victims are not included in the actual loss amount of approximately $112,000. *Id.* at 6.

*Second*, the Defendant readily agrees that he conspired with Henry and Haddox to submit unemployment claims. Again, while the Government does not assert that all $1.8 million in actual loss—the vast majority of which is derived from the PII in Henry's notebooks—was reasonably foreseeable to the Defendant, it defies logic that the *only* loss reasonably foreseeable to the Defendant is the actual loss from his notebook that encompasses only a snapshot in time. Indeed,

8

while the notebook was seized on July 11, 2020 (the same day Henry Notebook 1 was seized), the Defendant admitted that he conspired with Henry and Haddox from March 22, 2020 through at least July 2021—over a year after the Defendant's notebook was seized.

As such, the Government submits based on a preponderance of the evidence that the loss involved in the offense attributable to the Defendant is at least $150,000 but not more than $250,000.

### The Government's Recommended Sentence

At sentencing, the Government anticipates that, based on the Government's calculation of the Guidelines (20/CHC III), the advisory Guidelines range will be 41 – 51 months imprisonment. The government further anticipates that it will recommend a sentence of **51 months** imprisonment—regardless of the Guidelines calculations—pursuant to the factors set forth in 18 U.S.C. §3553(a). The Government further submits that this sentence should be ordered to be imposed consecutive to the Defendant's current sentence.

The nature and circumstances of the Defendant's offense are appalling. Not only did the Defendant loot the United States and the State of Maryland of thousands of dollars' worth of unemployment insurance benefits during the height of the COVID-19 pandemic, he did so while incarcerated at a federal facility using contraband phones. And, perhaps most alarmingly, the current offense is the *second* offense that the Defendant has committed *while incarcerated*. Moreover, in addition to other criminal conduct for which he has been convicted, while incarcerated, the Defendant has sustained a number of infractions, including failing to follow safety regulations, interfering with staff, engaging in sexual acts, introduction of drugs/alcohol, and possessing unauthorized items, among others. *See* Ex. 2 (BOP infraction report).

In sum: the egregiousness of the Defendant's conduct while incarcerated—including two criminal convictions—makes clear that a significant sentence must be imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter the defendant, and protect the public from future crimes.

### Restitution and Forfeiture

As agreed to by the Defendant pursuant to his Plea Agreement, the Government will seek restitution in the amount of at least $112,688, to be made payable to the MD DOL at the address provided in Paragraph 93 of the PSR.

### Conclusion

The Government respectfully contends that a sentence of 51 months is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

Erek L. Barron
United States Attorney


By:  _____/s/_____
Kelly O. Hayes
Assistant United States Attorney